**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PEARL FUNG, derivatively on behalf of INTERCEPT PHARMACEUTICALS, INC., | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT |
| Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| PAOLO FUNDARÒ, LUCA BENATTI, NANCY MILLER-RICH, DANIEL WELCH, MARK PRUZANSKI, DANIEL BRADBURY, GINO SANTINI, SRINIVAS AKKARAJU, KEITH GOTTESDIENER and GLENN SBLENDORIO, | Case No. 1:21-cv |
| Defendants, | |
| and | |
| INTERCEPT PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Pearl Fung ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Intercept Pharmaceuticals, Inc. ("Intercept" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations based upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by Intercept with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases issued and disseminated by Intercept; (iii) a purported securities class action lawsuit filed in the United Stated District Court for the Southern District of New York captioned *Chauhan v. Intercept Pharmaceuticals, Inc., et al.*, Case 1:21-cv-36 (S.D.N.Y.) (the

"Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly available information, including media and analyst reports, concerning Intercept.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Intercept against certain of its officers and directors seeking to remedy the Individual Defendants' (as defined below) breach of fiduciary duties, abuse of control, and unjust enrichment that occurred between September 28, 2019 and October 7, 2020, both dates inclusive (the "Relevant Period") and have caused substantial harm to Intercept.

2.      Intercept is a biopharmaceutical company that develops and commercializes therapeutics to treat progressive non-viral liver diseases in the United States.

3.      Intercept's lead product candidate is Ocaliva (obeticholic acid ("OCA")), a farnesoid X receptor agonist used for the treatment of primary biliary cholangitis ("PBC"), a rare and chronic liver disease, in combination with ursodeoxycholic acid in adults. The Company is also developing OCA for various other indications, including nonalcoholic steatohepatitis ("NASH").

4.      In 2016, Ocaliva was granted accelerated approval by the U.S. Food and Drug Administration ("FDA") for treating PBC.

5.      By late 2017, both Intercept and the FDA issued warnings regarding the risk of overdosing patients with the drug, and multiple reports of severe liver injuries and deaths linked with its use.

6.      Despite these warnings, Defendants continued to praise Ocaliva sales and supposed benefits, and its potential indication for treating various other medical conditions.  For

example, only two years later, in September 2019, Intercept submitted a New Drug Application ("NDA") to the FDA for OCA to treat patients with liver fibrosis due to NASH.

7.      During the Relevant Period, Defendants made materially false  and misleading statements regarding the Company's business, operational and compliance policies. Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants downplayed the true scope and severity of safety concerns associated with Ocaliva's use in treating PBC; (ii) the foregoing increased the likelihood of an FDA investigation into Ocaliva's development, thereby jeopardizing Ocaliva's continued marketability and the sustainability of its sales; (iii) any purported benefits associated with OCA's efficacy in treating NASH were outweighed by the risks of its use; (iv) as a result, the FDA was unlikely to approve the Company's NDA for OCA in treating patients with liver fibrosis due to NASH; and (v) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times.

8.      The Company reported on May 22, 2020, that the FDA "has notified Intercept that its tentatively scheduled June 9, 2020 advisory committee meeting (AdCom) relating to the Company's [NDA] for [OCA] for the treatment of liver fibrosis due to [NASH] has been postponed" to "accommodate the review of additional data requested by the FDA that the company intends to submit within the next week."

9.      In response to this announcement, the Company's stock price fell $11.08 per share, or 12.9%, closing at $80.51 per shares on May 22, 2020.

10.     The Company issued a press release on June 29, 2020, reporting that the FDA had issued a Complete Response Letter ("CRL") rejecting the Company's NDA for Ocaliva for the treatment of liver fibrosis due to NASH. Per the press release, "[t]he CRL indicated that, based on the data the FDA has reviewed to date," the FDA "has determined that the predicted benefit of

OCA based on a surrogate histopathologic endpoint remains uncertain and does not sufficiently outweigh the potential risks to support accelerated approval for the treatment of patients with liver fibrosis due to NASH." Further, the press release advised "[t]he FDA recommends that Intercept submit additional post-interim analysis efficacy and safety data from the ongoing REGENERATE study in support of potential accelerated approval and that the long-term outcomes phase of the study should continue."

11.    In response to this news, the Company's stock price fell $30.79 per share, or 39.73%, closing at $46.70 per share on June 29, 2020, wiping out approximately $1 billion in market capitalization.

12.    News outlets further reported on October 8, 2020, that Intercept was "facing an investigation from the [FDA] over the potential risk of liver injury in patients taking Ocaliva, [Intercept's] treatment for primary biliary cholangitis, a rare chronic liver disease."

13.    In response to this news, the Company's stock price fell $3.30 per share, or 8.05%, closing at $37.69 per share on October 8, 2020, wiping out approximately $100 million in market capitalization.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question seeking contribution under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Intercept is incorporated in this District.  In addition, the Defendants have conducted business in this District, and the Defendants' actions have had an effect in this District.

## PARTIES

18.     Plaintiff Pearl Fung ("Plaintiff") is, and was at all relevant times, a shareholder of Intercept. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

19.     Nominal Defendant Intercept is a Delaware corporation with principal executive offices located at 10 Hudson Yards, 37th Floor, New York, New York 10001.

20.     Defendant Paolo Fundarò ("Fundarò") is the Company's President, Chief Executive Officer ("CEO"), and a Chairman of the Company's Board of Directors (the "Board"). According to the Company's filings with the SEC, defendant Fundarò received $341,356 in compensation in 2019.

21.     Defendant Luca Benatti, Ph.D. ("Benatti") is a member of Intercept's Board, where she is a member of the Research and Development Committee, since July 2014. The primary purpose of the Research and Development Committee is to assist the Board in its oversight of the Company's strategic direction and investment in research and development, technology and manufacturing and to identify and discuss significant emerging trends and issues in science and technology and consider their potential impact on the Company. According to the Company's filings with the SEC, defendant Benatti received $326,356 in compensation in 2019.

22.     Defendant Nancy Miller-Rich ("Miller-Rich") is a member of Intercept's Board where she has served since April 2018. According to the Company's filings with the SEC, defendant Miller-Rich received $318,856 in compensation in 2019.

23.     Defendant Daniel Welch ("Welch") is a member of Intercept's Board where he has served since November 2015. According to the Company's filings with the SEC, defendant Welch received $328,856 in compensation in 2019.

24.     Defendant Mark Pruzanski, M.D. ("Pruzanski") co-founded the Company in 2002 and has served as the Company's President, CEO, and as a member of the Board since the Company's inception. According to the Company's filings with the SEC, defendant Pruzanski received $6,615,785 in compensation in 2019.

25.     Defendant Daniel Bradbury ("Bradbury") is a member of Intercept's Board where he has served since July 2016. Bradbury is a member of the Audit Committee. According to the Company's filings with the SEC, defendant Bradbury received $326,356 in compensation in 2019.

26.     Defendant Gino Santini ("Santini") is a member of Intercept's Board where he has served since November 2015. He has also served as a director since February 2018. Santini is a member of the Audit Committee. According to the Company's filings with the SEC, defendant Santini received $336,356 in compensation in 2019.

27.     Defendant Shivas Akkaraju, M.D., Ph.D. ("Akkaraju") is a member of Intercept's Board where he has served since October 2012. Akkaraju is a member of Research and Development Committee. According to the Company's filings with the SEC, defendant Akkaraju received $316,356 in compensation in 2019.

28.     Defendant Keith Gottesdiener, M.D. ("Gottesdiener") is a member of Intercept's Board where he has served since July 2016. Gottesdiener is a member of the Research and

Development Committee. According to the Company's filings with the SEC, defendant Gottesdiener received $316,356 in compensation in 2019.

29.     Defendant Glenn Sblendorio ("Sblendorio") is a member of Intercept's Board where he has served since February 2014. Sblendorio is a member of the Audit Committee. Sblendorio also serves as a financial expert on the Company Audit Committee, due to his purported experience in the pharmaceutical and biotechnology industries, leadership skills, operational and strategic expertise. According to the Company's filings with the SEC, defendant Sblendorio received $331,356 in compensation in 2019.

30.     Defendants Fundarò, Miller-Rich, Welch, Pruzanski, Bradbury, Santini, Akkaraju, Gottesdiener, Gottesdiener, and Sblendorio are collectively referred to hereinafter as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of Intercept were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Intercept were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## AUDIT COMMITTEE CHARTER

36.     Pursuant to the Audit Committee Charter:

The primary purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Intercept Pharmaceuticals, Inc. (the "Corporation") is to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to the Corporation's accounting and financial reporting practices, systems of internal control over financial reporting and audit process, as well as the quality and integrity of the Corporation's financial reports, the qualifications, independence and performance of the Corporation's independent registered public accounting firm (the "Independent Auditor"), the performance of the Corporation's internal audit function and the Corporation's processes for monitoring compliance with legal and regulatory requirements and the Corporation's Global Code of Business Conduct.

The Committee's responsibility is oversight. Management is responsible for the Corporation's financial statements, the appropriateness of the Corporation's accounting principles and reporting policies and the establishment and maintenance of adequate internal control over financial reporting. The Independent Auditor is responsible for performing an audit of the Corporation's annual financial statements and the Corporation's internal control over financial reporting, expressing an opinion as to the conformity of the Corporation's annual financial statements with generally accepted accounting principles, reviewing the Corporation's quarterly financial statements and other procedures. Each member of the Committee shall be entitled to rely on (i) the integrity of those persons within the Corporation and of the professionals and experts (such as the Independent Auditor) from which the Committee receives information, (ii) the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts absent actual knowledge to the contrary and (iii) representations made by the Independent Auditor as to any non-audit services provided by the Independent Auditor to the Corporation.

*　　　*　　　*

## III.　　DUTIES AND RESPONSIBILITIES

The Committee shall be directly responsible for the appointment, retention, compensation, evaluation, oversight and, if necessary, termination of the Independent Auditor and any other independent registered public accounting firm engaged by the Corporation (including resolution of disagreements between management and the Independent Auditor or any such other firm regarding financial reporting) for the purpose of preparing or issuing an audit report or related work. The Independent Auditor and each such other firm shall report directly to the Committee. The Committee may, in its discretion, seek stockholder ratification of its appointment of the Independent Auditor and make recommendations to the Corporation's stockholders with respect thereto.

The following shall be recurring duties and responsibilities of the Committee in carrying out its purposes. These duties and responsibilities are set forth below as a guide to the Committee, with the understanding that the Committee may alter or supplement them as appropriate under the circumstances, to the extent permitted by applicable law.

## A.　　**Financial Statements and Financial Reporting Process**

1.　　Review and discuss with management and the Independent Auditor the Corporation's annual financial statements, management's discussion and analysis related thereto and other disclosures to be made in the Corporation's Annual Report on Form 10-K prior to the filing thereof, including a discussion with the Independent Auditor of the matters required to be discussed under the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"), and recommend to the Board

whether such financial statements should be included in the Corporation's Annual Report on Form 10-K.

2.  Review and discuss with management and the Independent Auditor the Corporation's quarterly financial statements, management's discussion and analysis related thereto and other disclosures to be made in the Corporation's Quarterly Report on Form 10-Q prior to the filing thereof, including a discussion with the Independent Auditor of the matters required to be discussed under the applicable requirements of the PCAOB.

3.  Discuss with management the Corporation's earnings press releases and review the type and presentation of information to be included therein, including the use of "pro forma" or "adjusted" non-GAAP information.

4.  Review with management and the Independent Auditor the effect of regulatory and accounting pronouncements and initiatives on the Corporation's financial statements.

5.  Discuss with management and the Independent Auditor significant accounting of financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles, complex or unusual transactions (such as off- balance sheet structures and transactions, if any) and areas requiring significant judgments.

6.  In consultation with the Independent Auditor and the internal auditors, review the integrity of the Corporation's financial reporting processes, both internal and external.

7.  Report regularly to and review with the full Board any issues that arise with respect to the quality or integrity of the Corporation's financial statements, compliance with legal or regulatory requirements, the performance and independence of the Independent Auditor or the performance of the internal audit function.

8.  Discuss with the Independent Auditor the matters required to be discussed under the applicable requirements of the PCAOB relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, any significant disagreements with management and any significant changes in the audit plan.

9.  Receive, review and discuss reports and other communications required to be made by the Independent Auditor regarding (i) all critical accounting policies and practices; (ii) any critical audit matters arising from the current period audit; (iii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with

management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor; (iv) other material written communications between the Independent Auditor and management, such as any management letter or schedule of unadjusted differences; and (v) all other matters required to be communicated by the Independent Auditor to the Committee under the standards of the PCAOB and SEC rules.

10. Maintain and foster an open avenue of communication among the Committee and the Independent Auditor, the Corporation's financial management and the internal auditors.

11. Annually review and approve the Committee's report for inclusion in the Corporation's proxy statement or any other applicable filing as required by the SEC.

12. Review any other reports the Corporation issues that relate to Committee responsibilities.

## THE RESEARCH AND DEVELOPMENT CHARTER

37.      Pursuant to the Research and Development Committee Charter:

## I.      PURPOSE

The purpose of the Research and Development Committee (the "Committee") of the Board of Directors (the "Board") of Intercept Pharmaceuticals, Inc. (the "Corporation") is to assist the Board in its oversight of the Corporation's strategic direction and investment in research and development, technology and manufacturing (collectively, "R&D") and to identify and discuss significant emerging trends and issues in science and technology and consider their potential impact on the Corporation.

\*        \*        \*

## III.      DUTIES AND RESPONSIBILITIES

The following shall be recurring duties and responsibilities of the Committee in carrying out its purposes. These duties and responsibilities are set forth below as a guide to the Committee, with the understanding that the Committee may alter or supplement them as appropriate under the circumstances, to the extent permitted by applicable law.

1. Identify and discuss new and emerging trends in health care, pharmaceutical science, technology, manufacturing and regulation to assist the Corporation in making well-informed choices in the investment of its R&D resources.

2.      Review, evaluate and advise the Board regarding the quality, direction and competitiveness of the Corporation's R&D programs.

3.      Review, evaluate and advise the Board regarding the Corporation's progress in achieving its long-term strategic R&D goals and objectives.

4.      Review and make recommendations to the Board regarding the Corporation's internal and external investments in R&D, including any potential external investments in R&D (*e.g.*, potential acquisitions, alliances, collaborations, equity investments, manufacturing, contracts and grants) that are submitted to the Board for approval.

5.      Regularly review the Corporation's product development pipeline.

6.      Annually review and reassess the adequacy of this Charter and recommend to the Board any proposed changes for approval.

7.      Annually evaluate the Committee's performance.

8.      Perform any other activities consistent with this Charter, the Corporation's Bylaws and governing law or regulation, as the Committee or the Board deems necessary or appropriate.

38.      Each of the Individual Defendants further owed to Intercept and its stockholders the duty of loyalty, which requires that each favor Intercept's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain a personal advantage.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

39.      Intercept is a biopharmaceutical company that focuses on the development and commercialization of therapeutics to treat progressive non-viral liver diseases in the United States.

40.      Intercept's lead product candidate is OCA, a farnesoid X receptor agonist used for the treatment of PBC, a rare and chronic liver disease, in combination with ursodeoxycholic acid in adults. The Company is also developing OCA for various other indications, including NASH.

41.     The Company reported in May 2016 that the FDA had approved Ocaliva for the treatment of patients with PBC, granting the drug accelerated approval for that indication.

42.     In late 2017, the Company and the FDA both issued warning concerning the risk of overdosing patients with the drug, along with a number of reports of severe liver injuries and deaths connected to its use. For example, the Company issued a letter in September 2017 warning physicians against overdosing patients with Ocaliva, advising them that the druge3 has been tied to liver injuries and death among patients suffering from PBC. In addition, the FDA issued a safety announcement later that month entitled "FDA Drug Safety Communication: FDA warns about serious liver injury with Ocaliva for rare chronic liver disease," which warned doctors of reports of multiple deaths linked to the drug.

43.     Defendants, despite these concerns, continued to laud Ocaliva sales and OCA's supposed benefits, along with its potential for treating various other medical conditions. For example, only two years later, the Company submitted an NDA to the FDA in 2019 to treat patients with liver fibrosis due to NASH.

MATERIALLY FALSE AND MISLEADING STATEMENTS

44.     The Company issued a press release on September 27, 2019, lauding that it had submitted an NDA to the FDA for OCA to treat patients with liver fibrosis due to NASH (the "September 2019 Press Release"). The September 2019 Press Release also lauded that "[t]he submission is based on positive interim analysis from the pivotal Phase 3 REGENERATE study in patients with liver fibrosis due to NASH"; that, "[i]n the study, OCA 25 mg achieved its primary endpoint by demonstrating robust improvement in liver fibrosis (by ≥1 stage) without worsening of NASH at 18 months (p=0.0002 vs placebo)"; that "OCA is the only investigational therapy to meet the primary endpoint of a Phase 3 study in patients with NASH and is the only such therapy that the FDA has designated a Breakthrough Therapy for NASH with fibrosis"; and that, "[a]s

such, Intercept has requested a Priority Review for the NDA, which, if granted, would result in an anticipated six-month review period."

45.     The September 2019 Press Release continued to quote defendant Pruzanski, who stated that, "submission of the first NDA for the treatment of fibrosis due to NASH is a very important milestone for the field and the culmination of more than a decade of hard work" and that the Company "look[s] forward to continuing to work with the FDA through the NDA review period and believe[s] that, if approved, OCA has the potential to become an essential treatment for people living with advanced fibrosis due to NASH."

46.     The Company issued a press release on November 25, 2019, lauding that the FDA had accepted its NDA for OCA seeking accelerated approval for the treatment of liver fibrosis due to NASH and had granted the NDA priority review (the "November 2019 Press Release"). The November 2019 Press Release restated substantively the same statements as referenced in ¶ 44 above, lauding the NDA submission and the study results that supported it, while also representing that "[t]he FDA has assigned a Prescription Drug User Fee Act (PDUFA) target action date of March 26, 2020 for the NDA," and that, "[i]n the NDA filing acceptance notification letter, the FDA also indicated that it currently plans to hold an advisory committee meeting to discuss the application."

47.     In addition, the November 2019 Press Release quoted defendant Pruzanski, who stated that, "[i]f approved, OCA would be the first available therapy for patients with fibrosis due to NASH, a condition that is expected to become the leading cause of liver transplant in the U.S. as soon as 2020"; that "[i]t is exciting to achieve this critical regulatory milestone that brings [the Company] one step closer to [its] goal of delivering the first approved therapeutic to those living with this devastating disease"; that, "[f]rom OCA's prior designation as a Breakthrough Therapy

to the grant of priority review today, [the Company's] work with FDA continues to set an important precedent for the field"; and that the Company "look[s] forward to working with the [FDA] over the coming months as they review the first NDA in NASH."

48.     The Company issued a press release on February 25, 2020, reporting its fourth quarter and full year 2019 financial results and certain business updates (the "February 2020 Press Release"). Defendant Pruzanski is quoted in the February 2020 Press Release, stating that, "2019 was a pivotal year for Intercept given the positive results in [the Company's] Phase 3 REGENERATE study in liver fibrosis due to NASH and [its] subsequent filing for approval in both the U.S. and Europe"; that, "[a]t the same time, [the Company's] commercial team's outstanding execution helped [them] deliver net sales of approximately $250 million for Ocaliva in 2019 and they continue to reach more PBC patients globally"; and that, "[a]s [the Company] enter 2020, [the Company is] focused on successfully completing the U.S. regulatory process and ensuring full readiness to launch the first approved therapy for patients suffering from fibrosis due to NASH."

49.     The February 2020 Press Release also stated, with respect to the Company's sales of Ocaliva, stated that "[f]ull year 2019 Ocaliva net sales were $249.6 million, which represented growth of 40% as compared to the prior year"; that "Ocaliva net sales in 2019 were comprised of U.S. net sales of $187.5 million and ex-U.S. net sales of $62.1 million, as compared to U.S. net sales of $140.8 million and ex-U.S. net sales of $37.0 million in 2018"; that the Company "recognized $70.3 million of Ocaliva net sales in the fourth quarter of 2019, which represented growth of 33% as compared to the prior year quarter"; and that "Ocaliva net sales in the fourth quarter of 2019 were comprised of U.S. net sales of $53.5 million and ex-U.S. net sales of $16.8 million, as compared to U.S. net sales of $41.1 million and ex-U.S. net sales of $11.8 million in

the prior year quarter." These claims all indicated to the market the sustainability of the Company's revenues derived from its sales of the drug.

50.     Along with the February 2020 Press Release, the Company filed an annual report on Form 10-K with the SEC on February 25, 2020, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K). The 2019 10-K, with respect to the Company's sales of Ocaliva, stated that "[f]or the years ended December 31, 2019 and 2018, product revenue, net was comprised of U.S. Ocaliva net sales of $187.5 million and $140.8 million, respectively, and ex-U.S. Ocaliva net sales of $62.1 million and $37.0 million, respectively"; and that "[f]or the years ended December 31, 2018 and 2017, product revenue, net was comprised of U.S. Ocaliva net sales of $140.8 million and $115.8 million, respectively, and ex-U.S. Ocaliva net sales of $37.0 million and $13.4 million, respectively." These statements indicated to the market that sustainability of the Company's revenues derived from its sales of the Ocaliva.

51.     With respect to the Ocaliva-related deaths in PBC patients reported by the Company and the FDA in 2017, the 2019 10-K downplayed the continued risk of treatment with the drug, specifically, by transferring the blame onto improper prescription practices by healthcare providers. In relevant part, the 2019 10-K stated that "[i]n the course of [the Company's] post-marketing pharmacovigilance activities, deaths have been reported in PBC patients with moderate or severe hepatic impairment"; that "[i]n an analysis performed by [the Company] and in consultation with the FDA, [the Company] concluded that certain of these patients were prescribed once daily doses of Ocaliva, which is seven times higher than the recommended weekly dose in such patients"; that, "[a]s a result, in September 2017, [the Company] issued a Dear Health Care Provider ('DHCP') letter"; that "the FDA also subsequently issued its own drug safety

communication to reinforce recommended label dosing"; that "[b]oth communications remind healthcare providers of the importance of the recommended reduced dosing of Ocaliva in PBC patients with moderate or severe hepatic impairment, while reiterating the importance of monitoring PBC patients for progression of their disease and the occurrence of liver-related adverse reactions"; and that, "[i]n addition to the DHCP letter, [the Company] took actions to enhance education about appropriate use of Ocaliva," which included "reeducating physicians on the label, with a focus on ensuring appropriate dosing for patients with moderate or severe hepatic impairment; enhancing monitoring of patients for liver-related adverse reactions; and adjudicating reported cases of serious liver injury, including in patients with no or mild hepatic impairment."

52.     Further, the 2019 10-K stated that, "[i]n February 2018, [the Company] announced that the Ocaliva label in the United States had been updated by the FDA to include a boxed warning and a dosing table that reinforced the then-existing dosing schedule for patients with Child-Pugh Class B or C or decompensated cirrhosis"; that, "[i]n addition, the FDA issued an updated drug safety communication to accompany the revised label"; and that the Company "remain[s] focused on the safety of all of the patients using Ocaliva within and outside of [its] ongoing clinical studies and have engaged with relevant regulatory authorities to ensure that the Ocaliva label sufficiently reinforces the importance of appropriate dosing in patients with advanced cirrhosis."

53.     The 2019 10-K also lauded the regulatory hurdles the Company had overcome, and milestones they had met, in seeking to commercialize OCA in the U.S. for treating patients with liver fibrosis due to NASH, stating: "OCA has received breakthrough therapy designation from the FDA for the treatment of NASH patients with liver fibrosis"; that, "[i]n September 2019, [the Company] submitted a NDA seeking accelerated approval of OCA for liver fibrosis due to NASH in the United States"; that "[t]he FDA subsequently accepted [the Company's] NDA for

filing and granted a priority review designation for OCA for liver fibrosis due to NASH"; and that "[t]he FDA has set a PDUFA target action date of June 26, 2020 for the completion of its review of [the] NDA and has notified [the Company] that it has tentatively scheduled an advisory committee meeting relating to [the] NDA for April 22, 2020."

54.     The 2019 10-K also, with respect to OCA's purported benefits and safety profile for treating patients with liver fibrosis due to NASH, represented that "[i]n February 2019, [the Company] announced topline results from the planned 18-month interim analysis of [the] pivotal Phase 3 clinical trial of OCA in patients with liver fibrosis due to NASH, known as the REGENERATE trial"; that, "[i]n the primary efficacy analysis, once-daily OCA 25 mg met the primary endpoint agreed with the FDA of fibrosis improvement by at least one stage with no worsening of NASH at the planned 18-month interim analysis"; and that "[a]dverse events were generally mild to moderate in severity and the most common were consistent with the known profile of OCA."

55.     In addition, the 2019 10-K, specifically regarding respect to safety signals observed in the REGENERATE trial, represented that "[t]he frequency of serious adverse events was similar across treatment arms (11% in placebo, 11% in OCA 10 mg and 14% in OCA 25 mg) and no serious adverse event occurred in > 1% of patients in any treatment arm"; that "[t]here were 3 deaths (2 in placebo: bone cancer and cardiac arrest, 1 in OCA 25 mg: glioblastoma) and none were considered related to treatment"; that "[t]he most common adverse event reported was dose-related pruritus (19% in placebo, 28% in OCA 10 mg and 51% in OCA 25 mg)"; that "[t]he large majority of pruritus events were mild to moderate, with severe pruritus occurring in a small number of patients (< 1% in placebo, < 1% in OCA 10 mg and 5% in OCA 25 mg)"; that "[a] higher incidence of pruritus associated treatment discontinuation was observed for OCA 25 mg (< 1% in

placebo, < 1% in OCA 10 mg and 9% in OCA 25 mg)"; and that, "[a]ccording to the clinical study protocol, investigator assessed severe pruritus mandated treatment discontinuation."

56.     Similarly, the 2019 10-K also represented that, "[c]onsistent with observations from previous NASH studies, OCA treatment was associated with an increase in low density lipoprotein ('LDL') cholesterol, with a peak increase of 22.6 mg/dL at four weeks and subsequently reversing and approaching baseline at month 18 (4.0 mg/dL increase from baseline)"; that "[s]tatin therapy was initiated in 10% of placebo patients and 24% of each OCA treatment arm"; that, "[a]mong OCA patients who initiated statins, LDL cholesterol increases reversed and fell to below baseline levels by month 6"; that "[t]riglycerides rapidly and continually decreased in the OCA treatment arms through month 18"; that "[t]here were few and varied serious cardiovascular events and incidence was balanced across the three treatment arms (2% in placebo, 1% in OCA 10 mg and 2% in OCA 25 mg)"; that, "[i]n patients with type 2 diabetes, OCA treatment was associated with an early transient increase in fasting glucose and hemoglobin A1c with return to levels similar to placebo by month 6"; that "[n]o clinically meaningful changes were noted in non-diabetic patients"; that, "[w]ith respect to hepatobiliary events, more patients (3%) on OCA 25 mg experienced gallstones or cholecystitis compared to < 1% on placebo and 1% on OCA 10 mg"; and that, "[w]hile numerically higher in the OCA 25 mg treatment arm, serious hepatic adverse events were uncommon with < 1% incidence in each of the three treatment arms."

57.     The 2019 10-K also utilized generic, boilerplate representations concerning risks associated with the negative side effects of the Company's OCA-based candidates and products, including Ocaliva. One example reads that, "[u]nforeseen side effects from any of [the Company's] product candidates, including OCA, could arise either during clinical development or, if approved, after the approved product has been marketed"; that "[s]erious adverse events, including deaths,

in patients taking OCA have occurred in clinical trials and in the post-marketing setting, and [the Company] cannot assure you that additional serious adverse events in patients taking OCA in clinical trials or in the post-marketing setting will not occur"; and that "[t]he most common side effects observed in clinical trials of OCA for PBC were pruritus, fatigue, headaches, nausea, constipation and diarrhea."  This risk warning did not address the actual known risk regarding the likelihood of the FDA rejecting the NDA for OCA for treatment of liver fibrosis due to NASH because the treatment's benefits failed to outweigh its risks, nor the foreseeability of an FDA investigation into liver disease connected to Ocaliva's use in treating PBC. Rather the Company utilized a generic, catch-all provision instead.

58.     With regard to the risk that sales of Ocaliva may be adversely affected by safety and labeling changes required by the FDA, the 2019 10-K also utilized generic, boiler plate representations, stating that the "events [described above, concerning the Ocaliva- related deaths and actions taken in 2017 and 2018], the revised label, any future label changes that may be required by the FDA or other relevant regulatory authorities and any safety concerns associated with Ocaliva, perceived or real, may materially and adversely affect [the Company] Ocaliva commercialization efforts and, consequently, [the Company's] financial condition and results of operations." Here too, the Company elected to use a generic, catch-all provision that was not tailored to the Company's actual known risks regarding the foreseeability of an FDA investigation into liver disease associated with Ocaliva's use in treating PBC.

59.     The Company issued a press release on May 11, 2020, reporting its first quarter 2020 financial results and certain business updates (the "May 11, 2020 Press Release").  Defendant Pruzanski stated in the May 11, 2020 Press Release that, "[i]n the first quarter [the Company] saw better than anticipated Ocaliva net sales in [the] PBC business"; that these net sales "were

supported by continued strong total prescription trends and modestly higher than expected inventory demand towards the end of the quarter as certain customers responded to the uncertainty of the early COVID-19 period"; that the Company "ha[s] taken a number of important steps intended to . . . advance NASH launch preparation activities, all while continuing to deliver solid results"; and that the Company "remain very focused on the goal of bringing the first approved therapy to patients with advanced fibrosis due to NASH and expect to be well prepared for [the] upcoming FDA advisory committee meeting, which is tentatively scheduled for June 9, 2020."

60.    The May 11, 2020 Press Release also reported that "Ocaliva net sales in the first quarter of 2020 were comprised of U.S. net sales of $50.8 million and ex-U.S. net sales of $21.9 million, as compared to U.S. net sales of $38.0 million and ex-U.S. net sales of $13.8 million in the prior year quarter," and that "[t]otal revenue in the first quarter of 2019 included approximately $0.4 million of licensing revenue." These claims further indicated to the market the sustainability of the Company's revenues derived from its sales of Ocaliva.

61.    The statements referenced in ¶¶44-60 were materially false and misleading because the Company made false and/or misleading statements and/or failed to disclose that: (i) the Company caused or otherwise permitted downplaying of the true scope and severity of safety concerns associated with Ocaliva's use in treating PBC; (ii) the foregoing increased the likelihood of an FDA investigation into Ocaliva's development, thereby jeopardizing Ocaliva's continued marketability and the sustainability of its sales; (iii) any purported benefits associated with OCA's efficacy in treating NASH were outweighed by the risks of its use; (iv) as a result, the FDA was unlikely to approve the Company's NDA for OCA in treating patients with liver fibrosis due to NASH; and (v) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

62.     The Company issued a press release on May 22, 2020, providing a regulatory update concerning its NDA for OCA for the treatment of liver fibrosis due to NASH.  The May 22, 2020 Press Release stated that, "that based on discussions earlier this week, the [FDA] has notified Intercept that its tentatively scheduled June 9, 2020 advisory committee meeting (AdCom) relating to the company's [NDA] for [OCA] for the treatment of liver fibrosis due to [NASH] has been postponed"; that "[t]he postponement will accommodate the review of additional data requested by the FDA that the company intends to submit within the next week"; that "[t]he FDA has indicated that it will reach out to Intercept in the near future with a new proposed AdCom date"; and that "Intercept now anticipates that the FDA's review of its NDA will extend beyond the Prescription Drug User Fee Act (PDUFA) target action date of June 26, 2020."

63.     Per this news, on May 22, 2020, Intercept stock fell $11.18 per shares, or 12.19%, closing at $80.51 per share. Although the Company's stock price had declined, the Company's securities were still trading at artificially inflated prices due to the continued misrepresentations or omission s regarding the NDA for OCA for the treatment of fibrosis due to NASH, along with the true scope and severity of safety concerns with Ocaliva's use in treating PBC, which jeopardized Ocaliva's continued market acceptance and the sustainability of its sales.

64.     For example, defendant Pruzanski was quoted in the May 22, 2020 Press Release, stating that, "[w]hile this delay was unanticipated, following [the Company's] most recent dialogue with the FDA [the Company] believe that the additional data being submitted will be important in facilitating a more informed discussion at the AdCom," and that the Company "remain[s] confident in [its] NDA submission and look[s] forward to continuing to work with the FDA to bring the first treatment to patients with advanced fibrosis due to NASH."

65.     The Company issued a press release on June 29, 2020, reporting that the FDA had issued a CRL rejecting the Company's NDA for Ocaliva for the treatment of fibrosis due to Nash (the "June 2020 Press Release"). Pursuant to the June 2020 Press Release, "[t]he CRL indicated that, based on the data the FDA has reviewed to date," the FDA "has determined that the predicted benefit of OCA based on a surrogate histopathologic endpoint remains uncertain and does not sufficiently outweigh the potential risks to support accelerated approval for the treatment of patients with liver fibrosis due to NASH." The June 2020 Press Release also advised that the "[t]he FDA recommends that Intercept submit additional post-interim analysis efficacy and safety data from the ongoing REGENERATE study in support of potential accelerated approval and that the long-term outcomes phase of the study should continue."

66.     Defendant Pruzanski was also quoted in the June 2020 Press Release, stating that, "[a]t no point during the review did the FDA communicate that OCA was not approvable on an accelerated basis"; that the Company "strongly believe that the totality of data submitted to date both meet the requirements of the [FDA]'s own guidance and clearly support the positive benefit-risk profile of OCA"; that the Company "[is] disappointed to see the determination the [FDA] has reached based on an apparently incomplete review, and without having provided medical experts and patients the opportunity to be heard at the anticipated AdCom on the merits of OCA, which is a designated Breakthrough Therapy"; that "[t]he FDA has progressively increased the complexity of the histologic endpoints, creating a very high bar that only OCA has so far met in a pivotal Phase 3 study"; that, "[o]n behalf of the hepatology community, [the Company is] very concerned that the [FDA]'s apparently still evolving expectations will make it exceedingly challenging to bring innovative therapies to NASH patients with high unmet medical need"; and that the

Company "plan[s] to meet as soon as possible with the FDA to review the CRL and discuss options for an efficient path forward to approval."

67.     Per this news, on June 29, 2020, the Company's stock fell $30.79 per share, or 39.73%, closing at $46.70 per share, wiping out approximately $1 billion in market capitalization. Although the Company's stock price had declined, the Company's securities were still trading at artificially inflated prices due to the continued misrepresentations or omission s regarding the NDA for OCA for the treatment of fibrosis due to NASH, along with the true scope and severity of safety concerns with Ocaliva's use in treating PBC, which jeopardized Ocaliva's continued market acceptance and the sustainability of its sales.

68.     For example, defendant Pruzanski was quoted in the Company's August 10, 2020, press release announcing its second quarter 2020 financial results and certain business updates (the "August 2020 Press Release"), stating that "PBC business achieved its highest quarterly net sales to date in the second quarter"; that the Company "plan[s] to continue to invest in [their] growing PBC business"; and that the Company "anticipate[s] that [its] Ocaliva net sales, together with the announced reduction in [their] 2020 non-GAAP adjusted operating expense guidance, will help to ensure that [the Company is] financially well positioned to support the path forward in NASH."

69.     The August 2020 Press Release, regarding the Company's sales of Ocaliva, stated that the Company "recognized $77.2 million of Ocaliva net sales in the second quarter of 2020, as compared to $65.9 million in the prior year quarter"; that "Ocaliva net sales in the second quarter of 2020 were comprised of U.S. net sales of $59.6 million and ex-U.S. net sales of $17.6 million, as compared to U.S. net sales of $50.7 million and ex-U.S. net sales of $15.2 million in the prior year quarter"; and that the Company "[is] announcing 2020 Ocaliva net sales guidance of $300 million to $320 million, and lowering [the] previously announced 2020 non- GAAP adjusted

25

operating expenses guidance by $100 million to a range of $460 million to $500 million from a range of $560 million to $600 million." These statements further indicated to the market the sustainability of the Company's revenues derived from its sales of the drug.

70.     The statements referenced in ¶¶62-69 were materially false and misleading because (i) the  Company downplayed the  true scope and severity of safety concerns with Ocaliva's use in treating PBC; (ii) the foregoing increased the likelihood of an FDA investigation into Ocaliva's development, thereby jeopardizing Ocaliva's continued marketability and the sustainability of its sales; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH FULLY EMERGES**

71.     The Company filed a quarterly report on Form 10-Q with the SEC on August 10, 2020, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "2Q20 10-Q"). Although the Company issued the August 2020 Press Release earlier the same day (lauding sales of Ocaliva to the PBC community), the Company chose to disclose exclusively in the 2Q2020 10-Q that the FDA had initiated an investigation into whether Ocaliva caused liver disease, stating:

> *The FDA has notified us that in the course of its routine safety surveillance, in May 2020 the FDA began to evaluate a newly identified safety signal regarding liver disorder for Ocaliva which the FDA classified as a potential risk.* Pursuant to FDA guidance, this does not mean that the FDA has concluded that the drug has the listed risk or that the FDA has identified a causal relationship between Ocaliva and the potential risk. As part of our routine pharmacovigilance efforts, we have worked with the FDA to reconcile our internal safety database with the FDA Adverse Event Reporting System database and have been conducting additional signaling analysis and monitoring activities. Any safety concerns associated with Ocaliva, perceived or real, may adversely affect the successful development and commercialization of our product candidates and approved products,  including Ocaliva, and materially and  adversely  affect  our business.
>
> [Emphasis added].

That is, the Company chose to exclusively disclose that the FDA had initiated an investigation into Ocaliva's potential cause of liver disease, without emphasis, in a 97-page document, which also included over sixty other risk disclosures.

72.    On August 11, 2020, as a result of the lack of due regard and transparency regarding this disclosure, the Company's stock price fell only $0.25 per share, or 0.47%, closing at $52.58.

73.    Finally, on October 8, 2020, two months after the Company's initial disclosure of the FDA's investigation into whether Ocaliva caused liver disease, did news outlets and the markets truly become aware of the investigation. That day, STAT, an outlet for in-depth biotech, pharma, policy, and life science coverage and analysis, released a report (the "STAT Report") titled "FDA investigating whether Intercept Pharma drug is tied to potential liver injury risk," which stated that the FDA "is evaluating a potential risk of liver injury in patients who take the Intercept Pharmaceuticals drug Ocaliva to treat a certain type of liver disease", and that "[t]he FDA's inquiry into Ocaliva began in May and could take one year to complete, Intercept spokesperson Christopher Frates told STAT." *Seeking Alpha*, for example, covered the release of the STAT Report, reporting that "Intercept . . . is down on 60% higher volume in reaction to a report that the FDA is investigating a potential safety signal related to Ocaliva (obeticholic acid), specifically, the risk of liver injury."

74.    Per this news, on October 8, 2020, the Company's stock fell $3.30 per share, or 8.05%, closing at $37.69 per share on October 8, 2020, wiping out approximately $100 million in market capitalization.

## DAMAGES TO THE COMPANY

75.    As a result of the Individual Defendants' wrongful conduct, Intercept disseminated false and misleading statements and omitted material information to make such

statements not false and misleading when made. The improper statements have devastated Intercept's credibility. Intercept has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

76.      Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

77.      As a direct and proximate result of the Individual Defendants' actions as alleged above, Intercept's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

78.      Moreover, these actions have irreparably damaged Intercept's corporate image and goodwill. For at least the foreseeable future, Intercept will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Intercept's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DEMAND FUTILITY ALLEGATIONS

79.      Plaintiff incorporates all of the allegations herein by reference.

80.      Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

81.      Plaintiff is a stockholder of Intercept, was a stockholder of Intercept at the time of the wrongdoing alleged herein, and has been a stockholder of Intercept continuously since that time.

82.      Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

83.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Intercept Board to institute this action against the Individual Defendants. Such a demand would have been a futile and useless act with respect to each and every one of the current members of the Board because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS**
**BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

84.     The Individual Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

85.     Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Director Defendants knowingly and/or recklessly allowed, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial

likelihood of liability. If the Director Defendants were to bring a suit on behalf of Intercept to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to the Individual Defendants.

**THE INDIVIDUAL DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED**

A.  Defendant Pruzanski

86.     Defendant Pruzanski is the CEO and President of the Company and is also a director of the Company.

87.     Defendant Pruzanski is not disinterested or independent, and therefore, is incapable of considering demand because he (as CEO) is an employee of the Company who derived substantially all his income from his employment with the Company, making him not independent. As such, Pruzanski cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

88.     Additionally, the Company admits that defendant Pruzanski is not independent in its public filings with the SEC.

89.     This lack of independence and financial benefits received by defendant Pruzanski renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

90.     In addition, defendant Pruzanski is a defendant in the Securities Class Action rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

B.  Defendants Sblendorio, Bradbury and Santini

91.     During the Relevant Period defendants Sblendorio, Bradbury, and Santini served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

92.     Defendants Sblendorio, Bradbury, and Santini breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated by the Company as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

93.     Therefore, defendants Sblendorio, Bradbury, and Santini face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

C.  Defendants Benatti, Akkaraju, and Gottesdiener

94.     During the Relevant Period, defendants Benatti, Akkaraju and Gottesdiener were members of Intercept's Research and Development Committee.

95.     The purpose of the Research and Development Committee is to assist the Board in its oversight of the Corporation's strategic direction and investment in research and development, technology and manufacturing.

96.     Defendants Benatti, Akkaraju and Gottesdiener breached their fiduciary duties of due care, loyalty, and good faith, because the Research and Development Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated by the Company as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

97.     Therefore, defendants Benatti, Akkaraju and Gottesdiener face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### (Against The Individual Defendants For Breach Of Fiduciary Duties)

98.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

99.     Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Intercept's business and affairs.

100.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

101.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Intercept.

102.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the safety risks associated with Ocaliva. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

103.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

104.     The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

105.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

106.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

107.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Intercept has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

108.     Plaintiff on behalf of Intercept has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (Against The Individual Defendants For Unjust Enrichment)

109.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

110.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense and to the detriment of Intercept.

111.    All the payments and benefits provided to the Individual Defendants were at the expense of Intercept. The Company received no benefit from these payments.

112.    Plaintiff, on behalf of Intercept, seeks restitution from the Individual Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

113.    Plaintiffs, on behalf of Intercept, have no adequate remedy at law.

### THIRD CAUSE OF ACTION

### (Against Defendant Pruzanski For Contribution Under Sections 10(b) and 21D Of The Exchange Act)

114.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

115.    The Company, along with defendant Pruzanski is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to defendant Pruzanski's willful and/or reckless violations of his obligations as an officer and director of the Company.

116.    Through his position of control and authority as officers of the Company, defendant Pruzanski was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Action and herein.

117.      As such, defendant Pruzanski is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff demands judgement as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Intercept, and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to Intercept and committed other violations of law as alleged herein;

C.      Awarding Intercept the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

D.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

E.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to the institution of appropriate corporate governance measures;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 1, 2021                      Respectfully submitted,


                                             /s/  Blake A. Bennett                            .
                                             **COOCH AND TAYLOR, P.A.**
                                             Blake A. Bennett (#5133)
                                             Dean R, Roland (#6459)
                                             The Nemours Building
                                             1007 N. Orange Street, Suite 1120
                                             Wilmington, DE 19801
                                             Telephone: (302) 984-3800
                                             Email: bbennett@coochtaylor.com
                                                      droland@coochtaylor.com

                                             *Attorneys for Plaintiff*


**OF COUNSEL**

BRAGAR EAGEL & SQUIRE, P.C.
Garam Choe
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (646) 860-9449
Email: choe@bespc.com